# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Geraldine Soat Brown | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 1909 | **DATE** | 9/11/2002 |
| **CASE TITLE** | Bailey vs. Barhnhart | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter memorandum opinion and order. For the reasons set out in the Memorandum Opinion and Order, the plaintiff's motion for summary judgment [dkt 16] is granted, and this matter is remanded back to the Commissioner for further proceedings in accordance with the Opinion. *Geraldine Soat Brown*

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | |
| | No notices required. | | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | SEP 12 2002 | | 25 |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | | docketing deputy initials | |
| | Mail AO 450 form. | | | | |
| | Copy to judge/magistrate judge. | | | 9/11/2002 | |
| | | | | date mailed notice | |
| JD | courtroom deputy's initials | | | JD | |
| | | | Date/time received in central Clerk's Office | mailing deputy initials | |

WILL BAILEY,                                    )
        Plaintiff,                       )    Cause No. 01 C 1909
                              )
        v.                               )    Magistrate Judge Geraldine Soat Brown
                              )
JO ANNE B. BARNHART,[1] Acting                  )
Commissioner of Social Security                 )
Administration,                                 )
        Defendant.                       )

## MEMORANDUM OPINION AND ORDER

Plaintiff Will Bailey brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the decision of the Commissioner of Social Security denying his application for disability benefits under the Social Security Act, 42 U.S.C. 423 *et seq.* (the "Act"). Plaintiff has filed a motion for summary judgment [dkt 16-1] and memorandum in support to reverse and remand the Commissioner's final decision. ("Pl.'s Mem." [dkt 16-2].) The Commissioner has not filed the customary cross-motion for summary judgment, but has filed a brief in support of the Commissioner's decision. ("Def.'s Mem." [dkt 20].) The parties have consented to the jurisdiction of the Magistrate Judge pursuant to 28 U.S.C. § 636(c). [Dkt 10, 11.] Therefore the decision of this Court constitutes the final ruling on this matter. For the reasons set forth below, the Court GRANTS

---

[1] The defendant in this case was listed previously as William Halter, Acting Commissioner of the Social Security Administration. On November 9, 2001 Jo Anne B. Barnhart became the Commissioner of Social Security. Accordingly, pursuant to Fed. R. Civ. P. 25(d)(1) (2002) and 42 U.S.C. § 405(g) (2001), Jo Anne B. Barnhart is substituted for William Halter as the defendant in this suit.

Plaintiff's motion, and REMANDS this case for further proceedings consistent with this opinion.

## PROCEDURAL HISTORY

In May, 1995, Plaintiff was granted Supplemental Security Income (SSI) benefits. (R. 57-62.)[2] The Social Security Administration (SSA) found at that time that drug and alcohol addiction was a contributing factor material to Plaintiff's disability. (R. 60.) In April 1995, Plaintiff reported that he had abused alcohol, cocaine and heroin since he was 17 years old, and that he had tried several treatment programs in Chicago and Detroit. (R. 118.) At that time, he alleged that he had quit using heroin and cocaine, but that he still drank alcohol and was on methadone treatment. (*Id.*) Plaintiff also claimed that he suffered back pain stemming from an injury sustained in an automobile accident in 1964. (R. 115.)

Plaintiff, as a drug and alcohol abuser, stood to lose his SSI benefits on January 1, 1997. On March 29, 1996, Congress enacted the Contract with America Advancement Act of 1996 ("Contract with America"). Pursuant to the Contract with America, the Social Security Act, which previously had provided disability benefits to "aged, blind, or disabled individuals" regardless of their histories of substance abuse, now stated that "an individual shall not be considered to be disabled . . . if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 1382c(3)(J).

On July 30, 1996, Plaintiff, who claimed that he had not received a termination notice, appealed the SSA's decision to terminate his benefits. (R. 63.) In particular, Plaintiff asserted that

---

[2] "R.___" refers to the certified record of proceedings, evidentiary documents, and administrative hearing transcript prepared by the Social Security Administration's Office of Hearings and Appeals pursuant to 42 U.S.C. § 405(g). [Dkt 9.]

he was disabled without considering his history of drug and alcohol abuse. (*Id.*) A hearing was held on November 22, 1996. (R. 64.) At the hearing, Plaintiff testified that he was disabled due to arthritis in the right side of his back that caused constant pain, high blood pressure causing shortness of breath, and difficulty with understanding, remembering and concentration. (R. 65.) Plaintiff claimed that his arthritis was so severe that he was unable to bend over without a wall to lean on or without falling to one knee, and that he was unable to perform any household duties because of his back pain. (*Id.*) Plaintiff was able, however, to ambulate without difficulty and the hearing officer noted that his concentration and recall were adequate. (R. 66.) The hearing officer also referred to medical evidence in the file (discussed in greater detail below) that indicated the presence of a normal range of motion in all weight-bearing joints and normal neurological functioning. (*Id.*) Further, the hearing officer noted that psychological and psychiatric consultative examinations performed in October 1996 indicated that Plaintiff was still using drugs and alcohol. (*Id.*) The hearing officer concluded that Plaintiff was not disabled in the absence of substance abuse. (R. 70.)

In a decision dated December 12, 1996, the SSA affirmed its previous findings and confirmed that Plaintiff's benefits would terminate on January 1, 1997. (R. 84-86.) The SSA sent a standard written notice to Plaintiff advising him of the adverse decision and of his right to challenge the decision and request a hearing before an administrative law judge. (*Id.*) The notice stated that Plaintiff could have "a friend, lawyer, or someone else" help him with the appeal process, and informed him that there were groups that could help him find a lawyer or provide free legal services, that there were lawyers who would take the case on a contingency, and that Plaintiff could contact the Social Security Office for a list of groups that might be able to help him. (R. 85-86.)

On February 21, 1997, Plaintiff requested a hearing in front of an Administrative Law Judge

3

("ALJ"). (R. 87.) Plaintiff stated that he disagreed with the cessation of his benefits because he suffered from disabling chest pains, back pain, shortness of breath and stiff limbs. (*Id.*) On April 17, 1998, Plaintiff appeared before an ALJ for hearing in Evanston, Illinois. (R. 36.) Plaintiff's friend Raymond Dudley, with whom he was living at the time, represented him at the hearing. (R. 38-39.) Mr. Dudley is not an attorney. (R. 19.) The eleven-page transcript of the hearing indicates that began at 11:00 a.m. and ended at 12:00 p.m. (R. 38, 49.) On May 20, 1998, the ALJ handed down his unfavorable decision. (R. 16.) Plaintiff timely filed his request for review of the ALJ's decision on May 27, 1998. (R. 14.) The Appeals Council denied Plaintiff's request on July 6, 2000. (R. 5.) Plaintiff was granted an extension of time to file an appeal in the district court (R. 3), and on March 19, 2001, Plaintiff filed his timely complaint for judicial review pursuant to 42 U.S.C. § 405(g). [Dkt 1.]

## BACKGROUND AND MEDICAL HISTORY

Plaintiff was born in Mississippi on June 24, 1942, and received four or five grades of education. (R. 116, 92.) The extent of Plaintiff's ability to read and write is questionable. (R. 103, 112.) Plaintiff worked on a farm in Mississippi until he was seventeen years old, then moved to Chicago, where he worked at a steel company for six years and subsequently at a construction company off and on for five years. (R. 118-19.) In the fifteen years prior to his hearing, Plaintiff had not worked. (R. 26.) Plaintiff developed a substance abuse problem around the time he moved to Chicago. (R. 118-19.) He claims that he was fired from jobs due to his drug and alcohol abuse, and that he was jailed over twenty times for drug-related offenses and disorderly behavior. (R. 119.)

In 1964, Plaintiff was involved in an automobile accident and suffered a back injury for

4

which he was treated for about a year. (R. 115.) Plaintiff claims that this back injury has caused a variety of problems: he cannot sit or stand for more than a half hour due to pain; his right leg goes numb if he walks for more than a block; and he experiences constant lower back pain. (R. 115.) Plaintiff received some treatment for his back pain while incarcerated in 1993, but as of March, 1995, reported that he had not seen a doctor for approximately two years. (R. 115.)

In the spring of 1995, Plaintiff lived in Detroit with his daughter. (R. 106.) At that time, Plaintiff first applied for SSI benefits and filled out a disability report on January 3, 1995. (R. 96-101.) In this disability report, Plaintiff reported that he had a drug problem and back problems. (R. 96.) Plaintiff also reported that he was undergoing methadone treatment at the Project Life Substance Abuse Center in Detroit, and that his daily activities consisted of cooking for about 15 minutes before needing to rest, watching television, and listening to the radio. (R. 97, 99.)

Reviewing Plaintiff's 1995 application for SSI benefits, two state agency medical consultants, Drs. Bianchin and Rucker, recommended additional consultative examinations, including x-rays of the lumbar spine with radiologist's report. (R. 113-14.) On March 28, 1995, Dr. Sanghvi, an orthopedist, performed a physical examination to evaluate Plaintiff's claims of low back pain stemming from the 1964 automobile accident. (R. 115.) Dr. Sanghvi reported that Plaintiff walked without a limp, and was able to walk on his heels and toes, tandem walk, squat, and kneel down. (R. 116.) Plaintiff had full movement of the cervical spine, and Dr. Sanghvi noted that there were no obvious clinically demonstrable neurological deficits in his upper or lower extremities, and no muscle weakness detected in the lower limbs. (*Id.*) When standing, however, Dr. Sanghvi noted that Plaintiff had a mild stoop, pelvic tilt, and mild dorsolumbar scoliosis. (*Id.*) Dr. Sanghvi also noted that Plaintiff experienced reduced straight leg raising in a supine position. (*Id.*) Dr. Sanghvi

5

obtained x-rays of Plaintiff's lumbar spine, and concluded that the x-rays showed advanced degenerative changes and a degree of spondylolisthesis (the forward displacement of one vertebra over another) secondary to arthritis. (R. 116-17.)

On April 4, 1995, Dr. Sadasivan performed a psychiatric evaluation of Plaintiff. Plaintiff told Dr. Sadasivan that he had abused heroin, cocaine and alcohol since he was 17, but that he had recently quit using heroin and cocaine. (R. 118.) Plaintiff also complained of depression, anger, irritability, hearing voices, crawling sensations under his skin, delusions of persecution, and crying spells. (R. 118, 120.) Dr. Sadasivan diagnosed Plaintiff with organic mood disorder, organic hallucinosis, alcohol abuse, and a history of crack cocaine and heroin abuse. (R. 121.) Dr. Sadasivan also assessed Plaintiff's Global Assessment of Functioning (GAF) at 40, a score that reflects some impairment in reality testing or communication or a major impairment in several areas. (R. 121.)[3] Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed., text revision 2000) ("DSM-IV").

On April 12, 1995, Dr. Bianchin, one of the state agency medical consultants who had requested the additional examinations, assessed Plaintiff's residual functional capacity (RFC) based on the orthopedist's report. (R. 122-29.) Dr. Bianchin opined that Plaintiff had an RFC to lift 50 pounds occasionally and 25 pounds frequently.[4] (R. 123.) Further, Dr. Bianchin stated that Plaintiff

---

[3] The GAF scale is a measure of the individual's overall level of psychological, social, and occupational functioning, and does not include impairment in functioning due to physical or environmental limitations. DSM-IV at 32.

[4] Dr. Bianchin's findings regarding Plaintiff's lifting abilities and sitting and standing capabilities are consistent with the Social Security Regulations' definition of medium work, which states that medium work "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 404.1567(c).

could stand or walk (with normal breaks) for a total of about 6 hours of an 8-hour workday and sit for a total of about six hours per 8-hour workday. (*Id.*) Dr. Bianchin placed no restrictions on Plaintiff's ability to climb, balance, kneel or crawl, but stated that he should stoop or crouch only occasionally. (R. 124.) Dr. Bianchin noted that the x-rays indicated advanced degenerative changes, but concluded that even so, Plaintiff had findings "consistent with limitations imposed by this RFC [medium work] or better." (R. 128.)

In 1996, Plaintiff applied for SSI benefits for the second time. Plaintiff was now living in Chicago with Raymond Dudley, who assisted Plaintiff in filling out the application. (R. 109, 111.) Plaintiff's July 30, 1996 Disability Report stated that he could not stand, walk or sit for long periods due to his constant back pain. (R. 88.) Plaintiff also reported that he did essentially nothing with his days, and that he had last seen a doctor about his back in 1986. (R. 89, 91.) On a September 26, 1996, questionnaire, Plaintiff reported that his regular activities consisted of watching television, listening to the radio, sometimes talking to neighbors or on the phone, visiting friends and family, dropping off his laundry twice a week, and grocery shopping once a month. (R. 109-10, 112.) Plaintiff also stated that his back pain had worsened, and that it prevented him from relating to other people, from taking care of his personal hygiene, and from sleeping. (*Id.*) Further, Plaintiff reported that he experienced problems with his memory, heard voices in his head, and experienced fear of harm stemming from being molested as a child. (R. 110, 112.)

In October, 1996, Dr. Guevara, a state agency consulting physician, examined Plaintiff to assess his complaints of low back pain. (R. 143.) Plaintiff complained of sharp, intermittent shooting pain to the left buttock, which radiated to the outer thigh and just below the knee, and sometimes caused his legs to give way. (*Id.*) Plaintiff also stated that he suffered back pain when

7

walking approximately one block, standing in line for about five minutes, and sitting upright for five or six minutes. (*Id.*) He reported that he was not taking any medication for the pain at the time of the examination. (*Id.*) Plaintiff admitted to Dr. Guevara that he had a history of alcohol and heroin abuse, and that he had consumed a pint of wine and snorted a bag of heroin the morning of the examination. (R. 144.) Dr. Guevara noted that there was no apparent deformity of Plaintiff's cervical, thoracic, or lumbar spine, nor any limitation of motion of any spinal segment. (R. 145.) Dr. Guevara further reported that the examination revealed no joint deformities, and that Plaintiff enjoyed a full range of motion of the proximal and distal joints of the upper and lower extremities. (R. 146.) Plaintiff was able to bear his own weight, and did not need a cane, crutch, or any other ambulatory assistance device. (*Id.*) Plaintiff's gait was noted as steady, and he was able to walk on heels, toes and in tandem. (R. 147.) Plaintiff's bulk and bilateral muscle tone was noted as normal, as was his muscle strength in his upper and lower extremities. (R. 146.) Dr. Guevara did not obtain an x-ray at this time, and diagnosed a history of low back pain without any evidence of lumbosacral radiculopathy (spinal nerve damage), a history of alcohol and heroin abuse, and a peripheral neuropathy (skin sensation abnormality in the legs) due to alcohol. (R. 147.)

On the same day, Plaintiff underwent a psychological examination performed by Dr. Casas. Dr. Casas observed that Plaintiff entered the room slowly and slightly hunched over, but after sitting during the 65-minute examination exited the room with a much more limber and fluid gait. (R. 150.) Plaintiff gave a number of nearly correct answers to questions about his age, address, and the date of the examination, which Dr. Casas noted is typical of individuals deliberately attempting to dissimulate. (*Id.*) Plaintiff stated that he had drunk one-half to one pint of wine before the examination, and indicated that he continued to use cocaine and heroin regularly. (R. 151.) Dr.

8

Casas administered the Wechsler Adult Intelligence Scale ("WAIS"), which indicated that Plaintiff functioned within the mild range of mental retardation for his age group. (R. 152.) Dr. Casas, however, deemed the test scores invalid and unreliable due to Plaintiff's deliberate underperformance and his alcohol and heroin ingestion in the 24-hour period preceding the examination. (*Id.*) Dr. Casas concluded that Plaintiff likely functions within the low average or borderline range of general intellectual ability for his age group. (*Id.*)

On October 9, 1996, Dr. Lembke performed a psychiatric evaluation on Plaintiff. (R. 154.) Plaintiff told Dr. Lembke that he continued to use cocaine and heroin, and that he had been in a methadone program in 1995, but dropped out because he could not afford the methadone and did not like the way it made him feel. (*Id.*) Dr. Lembke also noted that Plaintiff was reluctantly cooperative, and that most of his answers were almost correct. (*Id.*) Dr. Lembke diagnosed a history of alcohol, cocaine and heroin abuse and probable dependence, and a history of back pain and hypertension. (R. 156.)

Later that month, Dr. Gonzalez, a state agency medical consultant, performed another functional capacity assessment and concluded (in what appears to be a stamped entry) that no functional physical impairments affecting Plaintiff's work related activities could be documented. (R. 158.) Dr. Gonzalez did not make entries on any portion of the report regarding his opinions about Plaintiff's lifting capabilities or sitting and standing abilities. (R. 159.) Dr. Gonzalez noted Plaintiff's complaints about low back pain, and referred to Dr. Guevara's findings that Plaintiff experienced a normal range of motion in his joints, was able to walk on heels and toes, and had a normal gait. (R. 165.) In contrast to Dr. Bianchin's earlier report, Dr. Gonzalez's comments contained no reference to the 1995 x-rays showing advanced degenerative disk changes and

spondylolisthesis. (R. 124, 128, 165.)

Also in late October, 1996, state agency psychological consultant Dr. Brister reviewed the evidence of record and concluded that Plaintiff's substance abuse rendered him incapable of performing even a simple job adequately. (R. 168.) Dr. Brister also opined that Plaintiff's drug and alcohol abuse was material, but that with abstinence, he would be able to engage in substantial gainful activity. (*Id.*)

In his application for a hearing before an ALJ on February 21, 1997, Plaintiff stated that he took 4 or 5 Tylenol 500's for pain per day, and 4 or 5 Actifed-C's for breathing per day. (R. 105.)

At the administrative hearing on April 17, 1998, Plaintiff's representative, Mr. Dudley, argued that Plaintiff should receive benefits because his education is limited to the fourth grade, his back pain renders him unable to walk even a short distance, and he has difficulty understanding and remembering which makes him unsuitable for employment. (R. 39.) The ALJ asked Mr. Dudley whether he had reviewed the documents in Plaintiff's folder that would form the basis of the ALJ's decision: Mr. Dudley responded that he had looked at "some." (R. 39.) The ALJ then entered the documents into evidence as Exhibits 1-30. (R. 40.)

Plaintiff testified before the ALJ that he had not used cocaine or heroin for a year and a half, and that he had never used alcohol.[5] (R. 41.) Plaintiff testified that he had participated in methadone programs in Detroit and Chicago, but that he had stopped attending the Chicago program six months prior to the hearing. (R. 42-43.) In response to the ALJ's questions about his back problems,

---

[5] The hearing before the ALJ took place on April 17, 1998. (R. 38.) Eighteen months prior to this date is October 17, 1996, approximately one week after the medical examinations in which Plaintiff told the SSA doctors that he had consumed drugs and alcohol on the morning of the examinations. (R. 144, 150.)

10

Plaintiff testified that he had not seen a doctor in Chicago because he did not have health insurance, and that he hadn't found a doctor yet. (R. 43, 48.) Plaintiff testified that he is unable to sit or stand for prolonged periods, and that he experiences pain and numbness while walking, such that his left leg will collapse under him. (R. 44.) In response to the ALJ's questions about Dr. Guevara's normal findings, Plaintiff stated that Dr. Guevara, who found nothing wrong, had merely hit his knee to see how far he could raise his leg, and had not conducted any other tests. (*Id.*) Plaintiff testified that his back bothers him when he sleeps such that he sleeps on his stomach, and that his daily activities consist of watching television and going out to sit in front of the house. (R. 45.)

The ALJ also questioned Plaintiff about the apparent inconsistencies between Dr. Guevara and Dr. Casas' October 1996 reports concerning his continuing drug and alcohol use and Plaintiff's testimony that he had quit using drugs and had never drunk alcohol. (R. 47.) Plaintiff testified that he did not remember telling Dr. Guevara that he had snorted a bag of heroin that morning, and maintained that he never drank and did not understand why Drs. Guevara and Casas would state that he had. (*Id.*)

## DISABILITY DETERMINATION PROCESS

The Social Security regulations ("Regulations") prescribe the familiar sequential five-part test for determining whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520 and 416.920 (1999). The Commissioner must consider: (1) whether the claimant is presently unemployed; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any impairment listed in the Regulations as being so severe as to preclude substantial gainful activity; (4) whether the claimant is unable to perform his past relevant

11

work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy. *Id.; see also Young v. Secretary of Health and Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). An affirmative answer at either step three or step five requires a finding of disability, whereas a negative answer at any step (other than step three) precludes a finding of disability. The claimant bears the burden of proof at steps one to four; the burden shifts to the Commissioner at step five. *Id.*

When a claimant for disability benefits cannot be found disabled based on medical considerations alone, the Social Security Administration has established the Medical-Vocational Guidelines ("the Grid") in order to assess a claimant's ability to engage in substantial gainful activity.[6] *See* 20 C.F.R. Part 404, Subpart P, App. 2 (1999). The Commissioner's analysis at step five typically involves an evaluation of the claimant's residual functional capacity to perform a particular category of work (*i.e.*, sedentary, light, medium, heavy, or very heavy work), in combination with an application of the Grid to determine whether an individual of the claimant's age, education, and work experience could engage in substantial gainful activity. *Id.*

## THE ALJ'S DECISION

The ALJ identified the specific issue to be decided as whether drug and alcohol addiction remained a contributing factor material to Plaintiff's disability. (R. 20.) The ALJ stated that alcohol

---

[6] The Grid is a chart which classifies a claimant as disabled or not disabled, based on the claimant's physical capacity, age, education, and work experience. The Grid was promulgated to simplify the process, and improve the consistency, of disability determinations. These guidelines, though, are to be applied only when they accurately describe a claimant's abilities and limitations. *Heckler v. Campbell*, 461 U.S. 458, 462, n.5 (1983). If a claimant's non-exertional limitations restrict the full range of employment opportunities at the level of work that he or she is capable of performing, use of the Grid is precluded. *Id.*

and drug use is considered "material" pursuant to 20 C.F.R. 416.935(b)(2)(i) if the claimant would not be disabled if he or she ceased using drugs and alcohol. (*Id.*) The ALJ noted that Plaintiff had appealed the materiality finding on substance abuse on July 30, 1996, alleging disability due to chest pains, back pains, shortness of breath, and stiff limbs. (*Id.*) The ALJ then began the five-step analysis outlined above to determine whether Plaintiff was disabled considering all of the evidence, including the evidence of Plaintiff's substance abuse. (*Id.*)

First, the ALJ stated that there was no evidence that Plaintiff was currently engaged in substantial gainful activity and, therefore, no reason for denying his request at the first step. (R. 20-21.) The ALJ then determined at steps 2 and 3 that Plaintiff's impairments were "severe," which means that they significantly limited his ability to perform basic work activities, but that they did not meet the requirements or equal the level of severity contemplated for any impairment listed in Appendix 1 to Subpart P, Regulations No. 4. (R. 21.)

Before reaching Step 4 of the analysis, the ALJ set forth his findings regarding Plaintiff's residual functional capacity. (R. 21.) The ALJ found that Plaintiff's impairments do not prevent work-related activities except that Plaintiff's substance abuse condition would "seriously interfere with effective concentration, the ability to maintain a productive pace, and appropriate interaction with co-workers and supervisors, and causes a substantial loss of the ability to understand, remember, and carry out even simple instructions." (*Id.*)

The ALJ then discussed the bases for his finding. (*Id.*) First, the ALJ noted that the medical evidence in the record showed abnormal findings that dealt primarily with Plaintiff's substance abuse

13

disorder. (*Id.*) The ALJ referred specifically to an April, 1995 psychiatric evaluation[7], at which Plaintiff was diagnosed with organic mood disorder, organic hallucinosis, alcohol abuse, and a history of crack cocaine and heroin abuse. (R. 21, 118-21.) This psychiatric evaluation also reported that Plaintiff continued to drink alcohol by himself, craved cocaine, experienced depression and crying spells, heard voices, and experienced delusions of persecution. (R. 21, 120.) The ALJ also discussed an October, 1996 consultative examination in which Plaintiff reported drinking one pint of wine and snorting one bag of heroin the morning of the exam. (R. 21, 144.) He noted that psychological and psychiatric findings from October 8 and 9, 1996, included limited responsiveness, daily drinking, continued heroin and cocaine abuse, and probable substance dependence. (R. 22, 150-57.) The ALJ further stated that Plaintiff's examiners determined that he was incapable of managing his funds due to his substance abuse. (R. 22, 152, 156.)

The ALJ then opined that the medical evidence demonstrated a substantial loss of the ability to concentrate, understand, remember, and carry out simple instructions, and that consideration of the factors described in 20 C.F.R. 416.929(c) and Social Security Ruling 96-7p supported his finding regarding Plaintiff's residual functional capacity. (*Id.*) The ALJ noted that Plaintiff reported at times that he no longer used drugs and alcohol, but that he also reported to medical examiners that he continued to use alcohol and drugs. (*Id.*) The ALJ further stated that he relied in large part on the opinions of consulting physicians from the State Disability Determination Services, which ordinarily bear less weight than the opinions of treating physicians, but stated that their opinions deserve some weight along with other evidence, to reach the conclusion that Plaintiff is not disabled but for his

---

[7] The ALJ incorrectly refers to the date of the report as April 30, 1995, when the actual date of the report is April 4, 1995. (R. 118.)

14

substance abuse problem. (*Id.*)

The ALJ then proceeded to consider Plaintiff's argument that he is disabled, absent substance addiction, due to his back problems, high blood pressure, and mental problems. (R. 22.) The ALJ determined at Step 2 and 3 of the analysis that Plaintiff's impairments are severe, but that they do not meet the requirements or equal the level of severity contemplated in Appendix 1 to Subpart P, Regulation No. 4. (R. 22-23, 27-28.) The ALJ then concluded that the record, including Plaintiff's complaints of disabling pain, supported a residual functional capacity finding that Plaintiff was capable of performing the full range of unskilled work. (R. 23.)

Before discussing the medical evidence in support of that residual functional capacity, the ALJ summarized Plaintiff's alleged symptoms, impairments, and limitations. (R. 23.) The ALJ noted that Plaintiff claims to have been disabled since February 20, 1986, due to arthritis on the right side of his back, high blood pressure, and memory problems. (*Id.*) The ALJ considered Plaintiff's reports that he sleeps on his stomach to alleviate his back pain, that his left leg frequently goes numb, his legs collapse, and he cannot sit, stand or walk for very long. (*Id.*) The ALJ also referred to the July 30, 1996 Disability Report, in which Plaintiff reported that he essentially does nothing at all on a daily basis. (R. 23, 91.)

The ALJ then detailed the medical evidence in support of his finding that Plaintiff's residual functional capacity enables him to perform even heavy unskilled labor. First, the ALJ stated that, despite Plaintiff's complaints of constant, debilitating back pain, the medical evidence showed very little pathology. (R. 24.) The ALJ considered that the 1995 x-rays showed advanced degenerative changes and spondylolisthesis, but stated that the internal medicine consultative physical examination from March 1995 showed full range of motion of the cervical spine, no spasm, no

15

neurological deficits of either the upper or lower extremities, and normal finger dexterity bilaterally. (R. 24, 116.) He also noted that the examination showed no muscle weakness of the lower limbs and no sensory deficits, and that the examiner had reported that Plaintiff had no limp, was able to heel/toe walk, tandem walk, kneel, and squat. (*Id.*) Similarly, the ALJ commented that the only abnormalities reported at Plaintiff's October, 1996 evaluation were absent patella and ankle jerks bilaterally and reduced sensation to pinprick in the lower extremities. (R. 24, 116, 146.) He further stated that the second examiner had reported that Plaintiff's gait was steady, and he was able to walk without assistance. (*Id.*) The October, 1996 examination also showed that Plaintiff experienced a full range of motion, no joint deformities, no tenderness, normal manual dexterity, strength in upper and lower extremities at 5/5 bilaterally, and no evidence of lumbosacral radiculopathy. (*Id.*)

The ALJ then considered the medical evidence supporting Plaintiff's complaints of disabling high blood pressure. Although both the March 1995 and the October 1996 medical examinations showed that Plaintiff experienced elevated blood pressure, neither examination reported any abnormalities in pulse or breathing. (R. 24.)

Finally, the ALJ considered the evidence surrounding Plaintiff's complaints of mental incompetence. The ALJ noted that the psychiatric and psychological examinations performed in March 1995 and October 1996 indicated that Plaintiff was depressed with only fair contact with reality, but that he was oriented to time, person, and place. (*Id.*) The ALJ also commented that the examiner who administered the WAIS test disregarded Plaintiff's full scale IQ score of 67 as invalid due to Plaintiff's lack of effort and possible attempts to minimize his own capacity and, instead, opined that his IQ was likely 80 or above. (R. 24-25.) In addition, the ALJ noted that during the October, 1996 psychiatric examination, the examiner noted that although Plaintiff appeared

16

depressed and his stream of conversation was very poor, his speech was well articulated, his conversation was goal-directed, and his responses to questioning were almost entirely correct. (R. 25.) Also, the examiner made only one psychiatric diagnosis, which was a history of alcohol, cocaine, and heroin abuse and probable substance dependence. (*Id.*)

The ALJ then included a detailed discussion of his reasons for finding that Plaintiff's subjective complaints of disabling conditions were not credible. First, the ALJ noted that a major factor in discrediting Plaintiff's allegations of disabling conditions was the lack of a treatment history consistent with his complaints. (R. 25) Specifically, the record contained no evidence of treatment for back problems beyond Plaintiff's own assertions of treatment in the past. (*Id.*) Second, the ALJ focused on the fact that at times Plaintiff stated that he was taking medication for back pain and breathing problems (R. 105), but at other times reported taking no medications. (R. 25, 118.) Third, the ALJ determined that Plaintiff's reports of his extremely limited daily activities were incapable of verification and, even if true, might not be attributable to his alleged disabling conditions given the weak medical evidence supporting his complaints. (R. 26.) Finally, the ALJ stated that Plaintiff's generally unpersuasive appearance and demeanor at his hearing, along with the other above mentioned factors, contributed substantially to the ALJ's credibility finding. (*Id.*)

Thus concluding that the medical evidence and credibility determinations supported his finding that Plaintiff is capable of the full range of unskilled work, the ALJ continued to Step 4 of the disability determination analysis. (R. 26.) Because Plaintiff had not worked in the past 15 years, the ALJ found that he was not capable under Step 4 of returning to any past relevant work. (*Id.*) The ALJ then went on to Step 5, which requires the Commissioner to show that there are jobs existing in significant numbers in the national economy that Plaintiff can perform consistent with his age,

education, work experience, and functional limitations. (*Id.*) The ALJ found that Plaintiff was an individual of an advanced age with a marginal (less than 7th grade) education who had not acquired any skills in past relevant work that are transferable to other skilled or semi-skilled jobs. (*Id.*)

The ALJ observed that if the Plaintiff could perform the full range of all work, the Grid would lead to a finding of "not disabled." However, the ALJ observed, Plaintiff's residual functional limitations "do not exactly coincide with those considered under the Medical-Vocational Rules; thus, none of the rules can be applied to reach a result in this case." (R. 27, citation omitted.) The ALJ concluded that Plaintiff's additional limitations were "only slight" and did not significantly erode the base of available jobs. Accordingly, applying the Grid as "a framework for decision-making," the ALJ determined that significant numbers of unskilled jobs exist in the economy for Plaintiff to perform. (*Id.*)

In his findings, the ALJ concluded that, aside from the limitations attributable to his substance abuse, Plaintiff retained the residual functional capacity to perform the full range of unskilled work. (R. 28.) Finally, the ALJ concluded that Plaintiff was not disabled in the absence of drug and alcohol addiction and, therefore, in accordance with the Contract with America, was no longer eligible for disability benefits. (R. 29-30.)

## STANDARD OF REVIEW

The Social Security Act provides for limited judicial review of a final decision of the Commissioner (effectively that of the ALJ where, as here, the Appeals Council has denied the applicant's request for review). Where the ALJ commits an error of law, "reversal is required without regard to the volume of the evidence in support of the factual findings." *Imani v. Heckler,*

18

797 F.2d 508, 510 (7th Cir. 1986). With respect to the ALJ's conclusions of fact, the reviewing court's role is limited. There the role of the district court is only to determine whether the decision of the ALJ is supported by substantial evidence in the record. *Wolfe v. Shalala*, 997 F.2d 321, 322 (7th Cir. 1993). In reviewing the Commissioner's decision, the court may not decide facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994); *Brown v. Chater*, 913 F. Supp. 1210 (N.D. Ill. 1996)(Bucklo, J.). Thus, the court does "not substitute [its] own judgment for that of the ALJ." *Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir. 1997). Rather, the court must affirm a decision if it is supported by substantial evidence and the ALJ has made no error of law. *Herr v. Sullivan*, 912 F.2d 178, 180 (7th Cir. 1990); *Edwards v. Sullivan*, 985 F.2d 334, 336-37 (7th Cir. 1993). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

When evaluating a disability claim the ALJ must consider all relevant evidence and may not select and discuss only that evidence that favors his ultimate conclusion. *Herron*, 19 F.3d at 333. Where conflicting evidence allows reasonable minds to differ, the responsibility for resolving the conflict falls on the ALJ, not the court. *Herr*, 912 F.2d at 181; *see also Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989) (the ALJ has the authority to assess medical evidence and give greater weight to that which he finds more credible). Where there is a conflict between medical opinions, the ALJ may choose between those opinions but may not substitute his own lay opinion for that of the medical professionals. *Davis v. Chater*, 952 F. Supp. 561, 566 (N.D. Ill. 1996)(Keys, M.J.).

Although the district court's role is limited to determining whether the ALJ's final decision

is supported by substantial evidence and based upon proper legal criteria, this does not mean that the ALJ is entitled to unlimited judicial deference. In addition to relying on substantial evidence, the ALJ must articulate his analysis at some minimal level and state his reasons for accepting or rejecting "entire lines of evidence," although he need not evaluate in writing every piece of evidence in the record. *See Herron*, 19 F.3d at 333; *see also, Young v. Secretary of Health and Human Servs.*, 957 F.2d 386, 393 (7th Cir. 1992) (ALJ must articulate his reason for rejecting evidence "within reasonable limits" in order to allow for meaningful appellate review); *Guercio v. Shalala*, No. 93 C 323, 1994 WL 66102, *9 (N.D. Ill. March 3, 1994)(Marovich, J.)(ALJ need not spell out every step in his reasoning, provided he has given sufficient direction that the full course of his decision may be discerned) (citing *Brown v. Bowen*, 847 F.2d 342, 346 (7th Cir. 1988).)

## ANALYSIS

Plaintiff raises two primary challenges to the ALJ's finding that he is not disabled absent substance abuse. First, Plaintiff argues that the ALJ erred in finding that he is capable of performing the full range of unskilled work, which includes heavy work. Second, Plaintiff contends that the ALJ erred by not developing the record fully, especially given that Plaintiff was not represented by an attorney. In this regard, Plaintiff faults the ALJ for failing to advise him of his right to an attorney, failing to obtain more recent x-rays, failing to require the examining physicians to fill out the SSA's RFC evaluation form, and by conducting a hearing so brief that the transcript only reached eleven pages.

## I. Did the ALJ Err in Finding Plaintiff Capable of the Full Range of Unskilled Work?

Plaintiff first attacks the ALJ's finding that Plaintiff has the residual functional capacity to

perform the full range of unskilled work, including heavy work. According to the Social Security Regulations, "[h]eavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds." 20 C.F.R. 404.1567(d); 416.967(d). Plaintiff argues that the ALJ's residual functional capacity determination is not supported by substantial evidence because, he argues: (a) the ALJ made an independent medical determination, which was erroneous in light of the 1995 x-ray, that Plaintiff did not have a back problem that limited his work capability; and (b) failed properly to weigh the medical opinions pursuant to 20 C.F.R. § 404.1527(d). Specifically, Plaintiff complains that the ALJ accorded not enough weight to the 1995 x-ray that showed advanced degenerative changes and spondylolisthesis secondary to osteoarthritis, and too much weight to Dr. Gonzalez's determination that "no functional physical impairments affecting work related activities can be documented," (R. 158), and Dr. Guevara's finding of no evidence of lumbosacral pathology. (R. 147.) Plaintiff also argues that the ALJ failed to accord proper weight to Dr. Bianchin's residual functional capacity report (R. 123), which stated that Plaintiff could lift 50 pounds occasionally, and 25 pounds frequently, the benchmark of medium work. 20 C.F.R. § 404.1567(c). Notably, Plaintiff argues, had the ALJ determined that Plaintiff was capable of performing only medium work, application of the Grid would have mandated a finding that Plaintiff was disabled. 20 C.F.R. part 404, subpart P, Appendix 2, Table No. 3, Rule 203.10.[8]

Plaintiff correctly notes that Dr. Gonzalez's consultative report makes no reference to the 1995 x-rays obtained and interpreted by Dr. Sanghvi in March 1995. (R. 116-17.) Plaintiff further points out that, although Dr. Guevara noted that Plaintiff received medical treatment in 1993 while

---

[8] Grid Rule 203.10 states that a person of advanced age, limited education, no past relevant work, and a limitation to medium work, will be found disabled.

incarcerated and that "a lumbar spine x-ray was done at Cook County [Illinois] Hospital, with results unknown," it is unclear whether he is referring to the 1995 x-rays or x-rays taken in 1993. (R. 143.)[9] In contrast, Dr. Bianchin's 1995 consultative report specifically referred to the x-rays taken in 1995 and the results of those x-rays in reaching his conclusion that Plaintiff was capable of performing medium work, *i.e.*, work requiring lifting 50 pounds occasionally and 25 pounds frequently, "or better." (R. 123, 128.)

The Commissioner responds that the ALJ properly considered the x-rays in the context of all of the other medical evidence in the record. The Commissioner contends that Dr. Gonzalez reviewed the x-rays, and that the 1995 and 1996 medical examinations established that, in spite of the advanced degenerative changes and spondylolisthesis shown on the x-rays, Plaintiff showed normal walking abilities, normal ranges of motion in his joints and back, and no neurological deficits, muscle weakness, or muscle spasms. (R. 116, 145-46.) Moreover, the Commissioner claims, Dr. Bianchin's residual functional capacity finding of medium work "or better" also supports the ALJ's determination that Plaintiff is capable of performing the full range of unskilled work and, therefore, is not disabled.

The major issue here is whether and for what reason the ALJ rejected Dr. Bianchin's report, which relied on the 1995 x-rays in assessing Plaintiff's residual functional capacity at medium work "or better." There is no evidence that Dr. Guevara or Dr. Gonzalez actually reviewed the 1995 x-rays that established an objective medical cause for Plaintiff's complaints of back pain. The

---

[9] It is more likely that the reference to x-rays taken at Cook County Hospital is to x-rays that were taken in 1993 during Plaintiff's incarceration and not to the 1995 x-rays. Plaintiff lived in Michigan in 1995, and the medical examinations performed in connection with his application for benefits were done there. *See, e.g.*, Dr. Sanghavi's report. (R. 115.)

22

radiological report does not appear in the administrative record, and Dr. Bianchin is the only doctor who provided a residual functional capacity determination after *specifically* reviewing the 1995 x-rays. It is unclear from the ALJ's decision how much, if any, weight he accorded Dr. Bianchin's residual functional capacity determination, because that determination (Ex.20) is not mentioned at all in the written decision. *See* 20 C.F.R. § 404.1527(d) ("Regardless of its source, we will evaluate every medical opinion we receive.") Although the ALJ need not address in writing each piece of evidence in the record, he must nevertheless articulate his reasons for rejecting evidence "within reasonable limits" in order to allow for meaningful appellate review. *Young v. Secretary of Health and Human Servs.*, 957 F.2d 386, 393 (7th Cir. 1992); *see also Smith v. Apfel*, 231 F.3d 433, 438 (7th Cir. 2000) ("An ALJ may not simply select and discuss only that evidence which favors his ultimate conclusion.").

Furthermore, assuming that the ALJ considered Dr. Bianchin's residual functional capacity determination, the ALJ failed to articulate his reasoning for resolving the apparent conflict between Dr. Bianchin's and Dr. Gonzalez's respective residual functional capacity determinations in favor of Dr. Gonzalez's unrestricted residual functional capacity determination. Although it is within the purview of the ALJ to resolve conflicting medical evidence, *Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989), it is entirely unclear whether the ALJ determined that the evidence conflicted and, if so, how it conflicted. *See Hodes v. Apfel*, 61 F. Supp. 2d 798, 807 (N.D. Ill. 1999) (Castillo, J.) ("The level of articulation is heightened when there is conflicting evidence or when the ALJ rejects uncontradicted evidence.") Here, the conflict is particularly significant because, as Plaintiff argues, if the ALJ accepted a limitation to medium work, the Grid would dictate a finding of "disabled."

Remand is necessary because the ALJ has not provided sufficient articulation of his reasons

for apparently rejecting Dr. Bianchin's residual functional capacity determination or for weighing the medical evidence to conclude that it supported a finding that Plaintiff was capable of the full range of unskilled work. Meaningful appellate review under these circumstances is not possible. *See Young*, 957 F.2d at 393 (remanding case because the ALJ failed to articulate reasons for rejecting evidence favorable to claimant); *Hodes*, 61 F. Supp. 2d at 809 (remanding where the ALJ failed to provide a sufficient roadmap to support his conclusions where the evidence conflicted and the ALJ ignored evidence favorable to the claimant).

II. Did the ALJ Develop a Full and Fair Record?

A claimant has a statutory right to counsel at the disability hearing. 42 U.S.C. § 406; 20 C.F.R. § 404.1700. If properly informed of the right, the claimant may waive it. *Binion v. Shalala*, 13 F.3d 243, 245 (7th Cir. 1994). The Commissioner admits that the ALJ failed to obtain a valid waiver of that right to counsel before proceeding with the hearing. (Def.'s Mem. at 9.) Because no valid waiver of counsel was obtained, "the burden is on the Secretary to show that the ALJ adequately developed the record." *Binion*, 13 F.3d at 245. There is no bright line test to determine whether the ALJ has fully and fairly developed the record, and each case must be evaluated on its own facts. *Ferguson v. Massanari*, No. 01 C 1303, 2002 WL 472291, *8 (N.D. Ill. March 27, 2002)(Manning, J.). When a claimant proceeds *pro se*, the duty to develop a full record is heightened, and requires that the ALJ "'scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts.'" *Thompson v. Sullivan*, 933 F.2d 581, 585 (7th Cir. 1991)(quoting *Smith v. Secretary*, 587 F.2d 857, 860 (7th Cir. 1978). Failure to fulfill this obligation is "good cause" to remand for gathering of additional evidence. *Id.* at 586.

Plaintiff argues that the ALJ failed adequately to develop the record. Specifically, Plaintiff charges the ALJ with failing to ask Mr. Dudley if he had any questions for Plaintiff, with failing to order more recent x-rays, and by failing to request that a medical professional determine whether Plaintiff could lift up to one hundred pounds occasionally and 50 pounds frequently. (Pl.'s Mem. at 17-18.) Plaintiff also argues that the fact that the transcript is only eleven pages long demonstrates the ALJ's failure to develop the record fully and fairly. *See, e.g., Sears v. Bowen*, 840 F.2d 394, 403 (7th Cir. 1987) (noting that the hearing was only 32 minutes long and the transcript only 29 pages long in determining that the ALJ failed to develop a proper administrative record).

The Commissioner points out, however, that it is insufficient for Plaintiff merely to speculate or conjecture that additional information might have been obtained, but rather he must point to specific facts that were not brought out in the hearing or provide new medical evidence to indicate that the record was underdeveloped. *See Binion*, 13 F.3d at 246-47; *Luna v. Shalala*, 22 F.3d 687, 692 (7th Cir. 1994) ("[A] significant omission is usually required before [a] court will find that the Secretary failed to assist *pro se* claimants in developing the record fully and fairly."). The Commissioner argues that Drs. Bianchin, Guevara, and Gonzalez all considered the 1995 x-rays and none suggested that more recent x-rays were necessary for an accurate assessment or diagnosis. (Def.'s Mem. at 11.) However, as noted above, it is not apparent from the record that Drs. Guevara and Gonzalez in fact reviewed the 1995 x-rays. The Commissioner argues further that the mere fact that the transcript of the hearing only reached 11 pages is insufficient to suggest that the ALJ failed to develop the record.

Here, Plaintiff has pointed to specific information that the ALJ could have obtained before making his disability determination. At the very least, the ALJ could have asked Plaintiff specific

25

questions at the hearing about his lifting ability. The ALJ also could have obtained more recent x-rays. Although the x-rays in question were only three years old at the time of the hearing, it is possible that degenerative disk changes that were already considered advanced in 1995 may have worsened by 1998. *Compare Smith v. Apfel*, 231 F.3d at 437-38 (holding that the ALJ failed to develop a full and fair record when x-rays were 9 years old at the time of the hearing). A major defect here is the ALJ's failure to clarify the medical evidence. The ALJ did not contact Dr. Bianchin to obtain clarification of his residual functional capacity determination, a matter of critical ambiguity. *See* 20 C.F.R. § 404.1512(e) ("When the evidence we receive from your treating physician or psychologist or other medical source is inadequate for us to determine whether you are disabled, we will need additional information to reach a determination or a decision.") The ALJ also apparently did not ensure that the 1996 medical examiner and consultant, namely, Drs. Guevara and Gonzalez, had access to and considered the 1995 x-rays. As noted above, the radiological report is not in the record, and is not mentioned specifically in either Dr. Guevara or Dr. Gonzalez's reports. At a minimum, on remand the ALJ should make every effort to clarify Dr. Bianchin's residual functional capacity assessment, and to require that all examining and consultative examiners review the relevant radiological evidence and offer opinions about Plaintiff's capacity to perform medium or heavy work activities. *Accord Hodes*, 61 F. Supp. at 812 (remanding the case based on the ALJ's failure to resolve important ambiguities in the written record).

The significant ambiguity regarding Dr. Bianchin's residual functional capacity assessment and the weight accorded to the 1995 x-rays showing advanced degenerative disk changes and spondylolisthesis demonstrate the ALJ's failure to develop a full and fair record in this case. This failure constitutes good cause for remand. *Thompson*, 933 F.2d at 586.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment [dkt 16] is GRANTED, and this case is REMANDED for further proceedings in accordance with this opinion.

**IT IS SO ORDERED**:

**GERALDINE SOAT BROWN**
**United States Magistrate Judge**

**DATED:  September 11, 2002**